Good morning, Your Honor. Deputy Attorney General Stephen Mercer for Respondent Appellant. If I may, I'd like to reserve five minutes of my time for rebuttal. This case presents this Court with a highly unusual situation in which a district court, following an evidentiary hearing, has rejected all of petitioner's factual allegations, has found that his trial attorney has made a rational, carefully considered, and well-informed decision to forego an affirmative insanity defense, has found no ineffectiveness under Strickland v. Washington, and found, therefore, that the State Court adjudication of this claim was clearly correct. Yet, a writ has been granted. Why? For one reason, and a reason that, notably, not even petitioner defends, and that is that the district court believed that the Ninth Circuit's parenthetical citation to dicta in a pre-ADEPA Fifth Circuit case of Prophet v. Waldron set forth, under the law of the case doctrine, a nothing-to-lose standard of practice for attorneys. That was, therefore, made the district court feel it had to set aside its own independent Strickland analysis and, instead, grant relief. Now, no such directive appears on the face of this court's prior remand order, and respondent submits that the district court erred in referring one. And, again, not even petitioner disagrees with that argument. If I may comment briefly on something that wasn't really fleshed out in the briefs, and that involves the very nature of the law of the case doctrine. And I believe that the district court, in this case, was operating on a fundamental misunderstanding of that doctrine. The doctrine, as this court has said repeatedly, means that a court is generally precluded from reconsidering an issue that has been previously decided by the same court or a higher court in the identical action. But, in this case, this court said expressly, we do not reach the merits of this claim. So it argued that the district court got that wrong. The citation to profit was one of four parenthetical citations that this court included while discussing this claim the first time around and deciding whether an evidentiary hearing was required for this case. Profit was not the law of the case. It and the other cases were simply shorthand for describing the type of strickland concerns that might arise in this case, and that the district court was charged with investigating. The district court did investigate whether those strickland concerns were present, found that they were not present, and found no ineffectiveness under strickland, yet nonetheless felt bound by a mandate from this court that it felt gave it no alternative to grant the petition. There was no directive in that court order to set aside ADEPA, to set aside strickland, and instead decide this case under a nothing to lose standard. And this court, frankly, expressly said, ADEPA applies to this case and strickland governs this claim. And, again, both parties agree now that strickland is the governing substantive law. Now, if the district court was right, then the Ninth Circuit had essentially ordered a meaningless exercise to take place in the form of an evidentiary hearing, not something that this court makes a habit of. Rather, this court identified factual conflicts that needed to be fleshed out in an evidentiary hearing. This court identified factual assertions by petitioner that the parents had always been available and willing to testify, that Wager just abandoned their client wholesale, that Wager did so because of financial concerns, and the district, or the Ninth Circuit, found that it was an abuse of discretion in light of those factual allegations to deny relief without first having an evidentiary hearing. That was done, and in 51 pages of a 53-page report, carefully detailing all of the evidence in a strickland analysis, the district court concluded that counsel's decision was rational, well-informed, and well-considered, that the parents demonstrated an extreme reluctance to testify, which amounted to, quote, the same thing as an express refusal to testify, and outwardly rejected petitioner's allegations that counsel just gave up on because he was afraid he wasn't going to get paid for this. Were those firm factual findings, or were they findings to the effect that this is what I would likely find if I could do so? By the district court? Yes. These were firm factual findings, Your Honor, and it goes to something I'd like to bring to the Court's attention, and that is here we have a case where both parties have filed objections, a very unusual situation given that a writ was granted, but the vast bulk of petitioner's brief goes to attacking those very factual allegations. This is not a magistrate judge that just shot off a finding, a summary factual finding without thought or care. There's 27 pages of an induced summary of evidence, induced at the evidentiary hearing, replete with citations to the record and the existing state record that was presented to the state courts. This magistrate took great care backing up its factual findings, and whether we now disagree about those findings is beside the point. This Court is not a jury or a trier of fact, and we are not here to decide whether the district court should have made different findings or different credibility assessments. Rather, the only thing that matters for this Court's purpose is whether the findings the district court actually made were plausible. Clearly, they are plausible given this painstaking summary of evidence. Also, the findings themselves were entirely reasonable. As the district court recognized, this decision made at the end of trial is not to be viewed in isolation and cannot be completely divorced from defense counsel's overall trial strategy. The overall trial strategy was to secure a verdict of second-degree murder. He knew that if he did that, he might have a shot, a slim shot, but a shot at successfully arguing an NGI defense, an insanity defense. The fact of the matter is when he lost that key battle, he lost the war. That's the one thing that bothers me. If that was really his strategy, that he had to win that first before they end the guilt phase, why he didn't put all of his evidence, the other psychiatrists and so forth, into that, which he didn't. He was waiting. He only put one nurse there and one friend. Well, I would remind this Court that those claims have already been addressed earlier in that Petitioner had made those arguments, that counsel should have done that differently, that his trial strategy should have been done differently, that he should have put on those experts. The Ninth Circuit, when this case was first reviewed, found no ineffectiveness under any of that and found that the trial strategy was in fact reasonable and for good reason was that he was going to save the bulk of his mental health testimony for a sanity phase. And the fact that Dr. Satz, the one guilt phase witness, got destroyed on cross-examination, it was reasonable for him to think more of the same is not going to help my case. Nonetheless, despite the fact that the overarching... What was then the purpose for the hearing by the district judge? Why send it back? Well, to resolve the factual inconsistencies that were identified. Of what? Of the conflicting reasons for the... There were factual discrepancies leading up to the attorney's decision to withdraw the defense. Most of this happened within the 24-hour period after the guilt verdict to the next morning when the defense was withdrawn. Different allegations were made about those. We had asserted that there was no evidence that the parents had... I'm sorry, that there was no evidence refuting Wager's assertion that the parents refused to testify and that without them he was left with clinical experts, all of whom had based their opinion in part or in whole on the finding that they didn't think Petitioner could premeditate and deliberate the homicide, but the jury had already returned a verdict finding that he could premeditate and deliberate under a higher standard of reasonable doubt. So despite the fact that the overarching defense strategy had failed, Wager was still willing to go forward. He was willing to move forward with the sanity defense in an effort, really, to throw himself on the mercy of the jury. And he knew to do that that he needed the heartfelt testimony of the parents, the only contemporaneous source for his mental problems as a child. And when they refused to testify, he knew in his... as the district found, that there was not a reasonable likelihood of success for a sanity phase in that situation. Despite the factual disputes between the parties here, which, again, I believe are beside the point, this case really boils down to a couple of essential little nuggets. Number one, that if this court did, in fact, issue a mandate to decide this case under a nothing-to-lose standard of Prophet B. Waldron, Petitioner was still not entitled to relief because no United States Supreme Court precedent clearly announces such a rule that would be binding to the states. Now, on the flip side, if this court did not issue such a mandate, as the parties seemed to agree, and that the district court was to decide the case under Strickland v. Washington, as the parties agreed, then the district court's independent Strickland analysis should be implemented. That analysis, like I said, spanning 51 pages of 53 pages of this report, was painstaking, carefully thought out, and was, most importantly, in direct and total compliance with this court's remand order, and we would ask that it be implemented. Unless there are further questions, I'll save the balance of my time. Thank you. May it please the Court. Eric Wolthoff on behalf of Appellant Mears-Ans. The Ninth Circuit remanded the case for an evidentiary hearing primarily to answer the $64,000 question, did trial counsel have a plan B on behalf of Appellant Mears-Ans to get him some kind of relief, other, instead of, as an alternative to, the Plan A sanity defense that was ready to go? That is the $64,000 question that was supposed to be determined in the evidentiary hearing, and the evidence is categorical, unequivocal, that Wager had no, trial counsel Wager had no plan B. He testified there was nothing for Mears-Ans by withdrawing the insanity defense. That's the, that should have been the end of the Strickland analysis as far as deficient performance, because there was no plan B. Where we've gotten a little off track here is that the magistrate judge did make three factual findings contained at ER 177, none responsive to the $64,000 question. Rather, the three findings are that Wager did not act rashly. He considered whether or not to go forward. But whether an attorney acts rashly in abandoning his client, or whether he perseverates for a week before abandoning his client, he still abandoned the client. The magistrate judge never made a factual finding that Wager did have a plan B on Mears-Ans' part. Rather, he said that Wager was concerned. He was upset because the parents said something. He was all this kind of thing, and he rathiosinated about the problem. But he never had a plan B. He just dropped the insanity defense. But do, in all cases, do you have to have a plan B, given the facts that he was confronted with? Essentially, as I recall, this did happen within a 24-hour period. The parents said, essentially, we're reluctant to testify. There's some dispute as to what they said exactly. His plan originally was if he could get second-degree murder, there was a hope that he could make a run at this. But bottom line was there was some discussion as a reasonable possibility that the judge might be inclined to put the defendant in a psychiatric hospital or a psychiatric prison rather than a regular prison. And wasn't that part of the consideration that the attorney had in mind? Your Honor, that is what the Ninth Circuit remanded to find. Did Wager have a plan B where he had wired with the judge to get Mirza Yance all the psychiatric care? That was answered at the evidentiary hearing. That was made up. There was never anything like that. There was no plan to get the judge to do anything. There was no statement by the psychiatrist that he could get Mirza Yance into a psychiatric facility. That was resolved at the evidentiary hearing. He had no such plan. Well, one of the risks was that there was a fear that if this matter went forward that the judge, particularly if they found him sane, that the judge would certainly be in a position of being less sympathetic at the time of sentencing. Wasn't that part of the gist of the thought process at the time? No. Your Honor, if I may, the judge had no discretion at sentencing on a first-degree murder with a use clause. It's a mandatory sentence. It's prison for 25 years plus the use of a gun. So there was nothing. So, Your Honor, you're suggesting, because there was evidence in the declarations that preceded the evidentiary hearing where family members and friends had said that Wager said, well, we don't want to go forward because it will aggravate the judge and she won't be sympathetic at sentencing and I think I can get her to send Mirza Yance to a psychiatric facility. At the evidentiary hearing, Wager denied that, that he ever did that or said that. Wager denied it, acknowledged that there was never any such plan. There was never any backdoor route to psychiatric treatment for Mirza Yance. There was nothing for Mirza Yance. That was categorically established at the evidentiary hearing. And that answered the $64,000 question.  I'm not going to go forward with this particular defense because I can work out kind of a side deal with my colleagues at the Department of Corrections in the medical staff who will take good care of this client and he'll get 90 percent of what we're trying to get. Now, did Wager testify to that at the evidentiary hearing? No. He testified categorically that Mirza Yance got nothing from me withdrawing with insanity defense. If there's one thing I can convey to the court, Wager uncategorically acknowledged many times over Mirza Yance got nothing. Well, let me ask you this. Under your theory then, if your client is going to get nothing out of it and it's your last chance and you have nothing to lose, nothing to lose defense, do you think the law is that if you have nothing to lose you must go forward in all instances otherwise you're a violation of Strickland? No. If I may explain, what that question leaves out is that Mirza Yance had a very strong insanity defense which was abandoned, scuttled for no reason. Well, wait a minute now. And I apologize for interrupting, but as I recall reading the material, there were two or three psychiatrists, maybe four, that would have testified in favor of the defendant perhaps, but two of those, I believe, were subject to very severe cross-examination and there was great fear as to where they were going to go. And then there were two prosecution psychiatrists who were apparently fairly strong that he was perfectly sane. So, I mean, doesn't the attorney have to make an evaluation of what he's being hit with, or she, under these circumstances? And should the court now come in after the fact and ten years after all this occurred and say, well, now we're going to be Monday morning quarterbacks and we're going to redo this? I mean, this attorney is placed in a 24-hour period under extreme circumstances to make some decisions that are going to be binding forever. And now, of course, it looks like he should have zigged maybe when he zagged or arguably something of that nature. Is that really the Strickland standard under these circumstances? Your Honor, I'm going to say this directly because I have to on behalf of my client. A number of the things that you just incorporated into your question are not supported by the record. Okay. In terms of the strength of the psychiatric defense. The psychiatrists who testified at the evidentiary hearing included the four psychiatrists who would have testified on his behalf. They were cross-examinated by the State's lawyers. Look at all these things that you can, you know, what about this? Does that impeach your opinion? Does this impeach your opinion? They hung tough. They said this is all consistent with his mental illness and we're prepared to go forward now. We're always prepared to go forward with or without the parents. The parents' testimony is marginal to us. We were ready on the date of the insanity trials to go forward with an opinion and we're backing that up today. All four of them. None of them got wafty. None of them got wifty. You can imagine a situation where at an evidentiary hearing, the experts start to hem and haw and say, well, you know, I've got, I'm rethinking this. That didn't happen. They were strong. And here's the other point that I really need to make, Your Honor. You said there were two prosecution judges who were, two prosecution psychiatrists who were standing in contravention. Now, the magistrate judge did not acknowledge and the appellant doesn't acknowledge that the primary one who was believed to be favorable to the prosecution's case, Dr. C. Wright Anderson, on examination by the State's attorneys, said, my examination showed that Mirziens believed what he was doing was right at the time it occurred. A virtual proxy surrogate for an insanity defense. So in effect, one of the prosecution's doctors came in from the cold from the defense point of view and at the evidentiary hearing, M.E.R. 418, 419, that's the transcript where he's testifying. He says, in all, for all intents and purposes, my opinion is that at the time of this tragic killing, Mirziens believed, did not know that what he was doing was wrong. That's my opinion under cross-examination, under direct examination. So suddenly, there's a phalanx of five psychiatrists who are ready to testify. The evidentiary hearing shows that Mirziens' case is much stronger than it was when the Ninth Circuit looked at it. So what we have is, getting back to the real point of Your Honor's question, on the morning that the insanity defense was abandoned, trial counsel had available the same strong psychiatric defense that they'd been working on, that the family had been funding for years, with the one exception that the parents had shown reluctance to testify. Now, all the experts say that the parents were a peripheral part of the overall sanity presentation. The record is crystal clear. Wager says several times that he took no action to try to get the parents to testify under these circumstances. So even if he, Wager, believed in his view of this that the parents were crucial and the five experienced psychiatrists were not, he didn't do anything to get the parents to testify. That's abandoning his client over and above. He could have gone, okay, suppose with the parents' testimony on the morning of the sanity trial, the insanity defense was worth a 8.2 out of 10 points on a Richter scale of insanity defense. The parents don't testify. That really brought it down to a 7.6. All he has to do is carry the burden of proof, 5.1. There was no reason not to go forward. That's the end of a long answer to Your Honor's question, but I really would ask the Court to look carefully at the record, because the finding about Dr. Anderson is not reflected in the magistrate's report, it's not reflected in the respondent's brief, and it is reflected in Appley's brief. I want to come back to the issue of the parents testifying. In reality, I presume probably by the end of the trial the jury had a pretty good idea those people sitting in the courtroom, if they were there, I presume they were, were parents. They're now going to be sitting in the case on the issue of insanity, and the attorney is not putting the parents on the stand. Isn't that by itself a significant factor? I mean, the fact that you may have an academically provable insanity defense, but without the parents testifying on behalf of their own son, doesn't that say loads? And couldn't an attorney under those circumstances say, given these circumstances, I'm going to make a reasonable decision to abandon this, I don't use the word abandon, to not go forward on the insanity defense? I mean, we're not here to pick the best route. We're here to figure out whether within the law this is a reasonable choice, if we get to that issue. Your Honor, that, okay. So Your Honor has hypothesized the situation, the counsel said, the jury is going to, the jury might make an implicit adverse inference against us because the parents are sitting here, but they're not, they're not testifying. Well, the parents might not, the parents weren't in the country at the time of the incident, because they weren't precipient witnesses to any of the events leading up to the homicide. So what are they going to testify about? Were they at trial? Your Honor, at trial, half the courtroom was full of the family of the victim, half the courtroom was full of the family of the defendant. Of course they were there at the trial. They're devoted parents. But the point here is that suppose counsel said a jury might make an adverse inference as to the strength of the six psychiatric experiences, five psychiatric testimony, because I haven't called the parents to testify. Is that a reason to entirely disband? That's crazy. That's not a reason to entirely disband because you don't have a plan B. If the attorney said, okay, well, I'm going to go from my insanity defense to my alibi defense or something, then we would have a possible. But apparently he did have a plan B because the psychiatrists were ready to testify. Were they not? That's plan A, put on the psychiatrist to testify. He should have gone forward with his plan A. The psychiatrists were there, ready, willing, able to testify with undiminished strength. I see. So you're saying plan A is still at this sentencing hearing stage, right? No, we're at the insanity trial phase. At the insanity trial phase, okay, plan A started off at the beginning of the case. It's all about insanity, finding a not guilty by reason of insanity. The guilt phase goes on, occurs, and he's convicted. Now we get to the main event. It still should be plan A because the psychiatrists are ready to testify. The precipient witnesses for the previous week are ready to testify. There's documentary evidence from his background about mental health. Everything is ready to go except the parents expressed reluctance. So plan A was still front and center, ready to go. Under those circumstances So your plan B that you're talking about is something in addition that you can't identify, nor can he, as to what he plans to do in place of putting on the psychiatrist. Exactly, Your Honor. And that was the point of the remand. Did he have a plan B? And he categorically stated no plan B. I had no way to wire this with the prison. I had no way to get him into a psychiatric facility. I had no way to do anything except to consign him to 20 years to life in prison when I abandoned the defense. That's not So there was no plan B. That's the end of the Strickland inquiry on deficient performance. Because, Your Honor, I'd like to get away from this nothing to lose nomenclature because it's not helpful. If we look at it as foregoing a viable defense, which is the way the Ninth Circuit put it, and which is the way Strickland talks about, then things fall into place because he did abandon a viable defense. The magistrate judge found at ER 201 that he found factual findings that it was a viable defense. Quote, as witnesses could have testified credibly because he heard these psychiatrists. He never said anything bad about the psychiatrists other than they could have been impeached, but every psychiatrist can be, could have testified credibly and perhaps successfully, even though subject to potential strong cross-examination, prejudice is established as the court's confidence in the verdict, therefore, is undermined. That's the Strickland prejudice test that the magistrate judge found and the district court adopted. But the magistrate judge ultimately, I think, found that the decision was reasonable, didn't he? No. No, Your Honor. I need to refer, Your Honor, to ER 141. No, 177. Because what the, this is where the judgment is finding. It's, Wager did not act rashly, but instead made a decision that appeared reasonable to him and his co-counsel. Now, the test is whether it was objectively reasonable under the Strickland standard. It's not whether Wager had a thought, that Wager thought this and that over and decided to abandon the, the entire defense because the parents wouldn't testify if that's objectively unreasonable. And what we have here is the magistrate judge spent, expanded that factual finding with all sorts of references to the, the difficulty of the position that Wager was put into on the morning of the trial. And as Your Honor was alluding to, he's got to do something, right? Well, he could have asked for a continuance until the following Monday to get this rather than abandoning the client. But at the time, if the choice is, okay, I either lose everything and abandon this viable defense with my psychiatrists who are here, or I go forward and put them on, there's only one rational objection. Psychiatrists were there. Is that right? Pardon me? The psychiatrists were there? Yes. They were lined up to testify, four in a row. Okay. Oh, and at the hearing, they testified. The fact, the fact that the parents were reluctant, refusing to testify, that doesn't affect the strength of our opinion or, in our view, the presentation. There's thousands of insanity, well, it's not. There are many insanity defenses that go forward. The parents are not a necessary party to an insanity defense because what's more important is his mental state at the time of the offenses. The parents were 8,000 miles away and they're in, in France. So the parents were peripheral witnesses at best. So it could not have been an objective tactical decision to abandon that. You know, Your Honor, maybe the magistrate judge was trying to say that, that, that Wager used a case-related reason for not going forward as opposed to a truly irrational reason like I got up that morning, I rolled the dice, it came up boxcars, so I said no insanity defense. That would be totally irrational. Here, Wager had a case-related reason and the magistrate found it wasn't rash, in other words, considered, it wasn't arrived at without concern, but it was a, he never found that it was objectively reasonable under the circumstances. And this is where we have the magistrate did not acknowledge what the uncontested categorical testimony was, that Wager had no plan B. That's what the Ninth Circuit wanted to know. That's why the judgment has to be affirmed. Because there was no plan B. And with those, unless there are other questions, I'm guessing that my time is up. A couple of minutes. Very close up, but you have 40 seconds left. That's fine. Okay. In that case, Your Honor, I'm going to make a plea to review the testimony of Dr. C. Wright Anderson, who did join forces with the psychiatrists of the defense psychiatrists to present an opinion and even strengthen the likelihood of a positive outcome on that viable defense. All right. Thank you. Thank you. First, let me give a direct answer to the question that Judge Succo asked twice and did not get a response to. And that question was, is the law, is the Sixth Amendment standard, is that you must proceed if there is nothing to lose? The answer to that is no. Plain and simple. The Sixth Amendment has never required attorneys to have plan Bs. It has never required attorneys to proceed when there is nothing to lose. It has never required attorneys to make even all non-frivolous arguments. All those cases are cited in the briefs. In this case, we have repeated findings from the district court that the counsel's decision was well-informed, rational, well-considered, all of which directly distinguish it from profit, by the way. Was it an irrational defense if you had the psychiatrists all there, ready to testify, and then some of them saying, yeah, we would find that he wasn't? Oh, they were ready to testify because he was ready to proceed with an insanity trial. He was ready to proceed up until the morning he drove to court with the parents and they refused to testify. He had spoken to them the night before on the phone. He had them lined up. He had his files ready. He was ready to go. But when they bailed out of his case, he had nothing left but experts who had found that Petitioner couldn't premeditate and deliberate. Again, and the district court goes to great lengths to help. That wouldn't be irrational if you have experts that would testify they couldn't deliberate. What? No, it wouldn't be irrational. It was rational. The counsel's decision was rational. And it was as the Strickland standard was. No, I was saying that it would not be irrational for, as a defense, if the psychiatrists were willing to testify as you just stated. I wouldn't dispute that. But that's not. Then why not proceed with it? Because that's not the Sixth Amendment standard. And the simple question is, is because like every decision an attorney makes, it's based on a well-informed assessment. In this case, that there was no reasonable likelihood of success. That's the Strickland standard applicable here. And that standard does not change at the beginning of trial, at the end of trial, in the middle of trial. That's the standard. We have a well-informed, rational, carefully considered assessment that there was no reasonable likelihood of success, that this affirmative defense, where he bore the burden, would succeed. What is your take on the argument, and I picked it up somewhere in the briefing materials, that if this matter, if he didn't go forward with the insanity defense, that he had a better chance of being placed in a psychiatric prison by the judge who was going to do the sentencing? And that that was a possible consideration. Is that in there, or is it gone? I don't think that's supported by the record. All right. The wager was very forthright at the evidentiary hearing. He did not pretend that he had some great benefit to this decision. It was a decision that was based on whether it was going to succeed or not. He decided and made an assessment that it would not. And the district court, like every state and federal court before, found that to be a rational decision and not an effective or deficient performance under Strickland. And, again, the factual discrepancies here, we could litigate all day. Again, these competing factual findings, who's more credible, what psychiatrist would have been better, that's behind us now. The district court addressed those things. The district court's factual findings are clearly plausible, something which a petitioner fails to address. And that's the standard of review as set forth by this Court and the U.S. Supreme Court. Is the finding that the actions, and there's an argument over this, is the finding that the action of the attorney was reasonable, is that a factual finding or is it a mixed question of law and fact? I think it's a mixed question of law and fact. So it's a novel review? No, it's not in this situation, number one, because the district court made multiple factual findings upon which he based that decision, one of which was that this decision was rational, that it appeared reasonable to him and his experienced co-counsel at the time. That his decision was based on a well-informed assessment. He had consulted numerous expert witnesses. He convincingly detailed the ways that he knew that they would be subject to cross-examination. So we have extensive factual findings about the various psychiatric testimony, how an NGI defense would have likely proceeded. All of those result against the petitioner in this case. If you were to prevail at this level, and given the status of the record, what should the court do specifically? The court should implement the district court's lengthy, independent, stricter analysis. And I would say that there would be no necessary or no need to remand for the district court even to do that because its report is explicitly clear. It says, absent the perceived constraints from this court, this is what my opinion would look like. We would ask that that opinion be implemented. Were those opinions affirmed by the district court judge? Yes. The district court judge said, I reluctantly agree with the magistrate's findings because the way the magistrate had read the R&R and the remand order, that it too felt that it was bound by this perceived mandate and it had no alternative. So if the court were to rule your direction for any reason, you're not asking for a remand? No. Let me summarize and close with this thought, that even if this court in its independent judgment were to find that Wager was ineffective in this situation, it is at least reasonable for a court to come out the other way. And that's the standard under Early v. Packer in the United States Supreme Court. That is at least reasonable. And I would suggest that that reasonableness is borne out by the fact that three California Court of Appeal justices, seven California Supreme Court justices on two separate occasions, two different United States magistrate judges, one after the benefit of a lengthy, extensive evidentiary hearing where we had the ability to view live testimony, and one U.S. district court judge on two separate occasions all found no ineffectiveness under Strickland under these circumstances. And Respondent is confident that this court at the very least will acknowledge the reasonableness of the scores of State and Federal colleagues that have found no ineffective assistance under Strickland v. Washington in this case, and therefore the State court adjudication, in effect, must remain intact. Unless there are further questions. All right. Thank you, Counsel. Thank you. The case is heard, will be submitted, and the court will be adjourned.
judges: Hug, Wardlaw, Suko